# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ACCEPTANCE INSURANCE COMPANIES )
INC., )
      Plaintiff, )
                   )
                   )
v. )
                   )
THE UNITED STATES OF AMERICA, )
                   )
      Defendant. )

*8 NoCVWO9*

**CASE NO. 03-2794**
Judge Thomas C. Wheeler

## PLAINTIFF'S RESPONSE TO QUESTIONS
## PROPOUNDED IN THE COURT'S ORDER OF JUNE 14, 2006

In anticipation of oral argument on the pending motions in this case, the Court requested

that the parties be prepared to discuss a number of issues pertinent to the motions. Plaintiff

Acceptance Insurance Companies Inc. offers the following responses to the questions raised by

the Court in its June 14, 2006 Order:

**1. Does the "law of the case" doctrine prevent the Court from
reconsidering the issues decided in Judge Hodges' August 13, 2004 Order?**

\* \* \*

**Although the law of the case doctrine, being discretionary, does not
prevent the Court from reconsidering issues previously decided, it strongly
militates against reconsideration in the absence of extraordinary
circumstances. Because the Government has not demonstrated extraordinary
circumstances, there is no basis for reconsideration.**

The law of the case doctrine "is a judicially created doctrine, under which a court will

generally refuse to reopen or reconsider what has already been decided at an earlier stage of the

litigation." *Augustine v. Principi*, 343 F.3d 1334, 1339 (Fed. Cir. 2003) (quoting *Suel v.*

*Secretary of HHS*, 192 F.3d 981, 985 (Fed. Cir. 1999)); *see also Mendenhall & CMI Corp. v. Barber-Greene Co.*, 26 F.3d 1573, 1582 (Fed. Cir. 1994), *cert denied*, 513 U.S. 1018 (1994); *Stockton East Water Dist. v. United States*, 62 Fed. Cl. 379, 393 (2004). In *Suel*, the Federal Circuit explained that "[l]aw of the case is a judicially created doctrine, the purpose of which is to prevent relitigation of issues that have been decided." *Suel*, 192 F.3d at 984 (citing *Gould, Inc. v. United States*, 67 F.3d 925, 927-28 (Fed. Cir. 1995)). The court continued, "[t]he doctrine operates to protect the settled expectations of the parties and promote orderly development of the case." *Id.* (citing *Mendenhall*, 26 F.3d at 1582; *Little Earth of United Tribes, Inc. v. United States Dep't of HUD*, 807 F.2d 1433, 1441 (8th Cir. 1986)).

The law of the case doctrine is designed to "ensure[] judicial efficiency and prevent[] endless litigation," and its "elementary logic is matched by elementary fairness—a litigant given one good bite at the apple should not have a second." *Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 890 (Fed. Cir. 1984). In this case, the Government presented its arguments to support its Motion to Dismiss to Judge Hodges and should not now be given a second "bite" at the arguments that he fully considered and squarely rejected, which is all the Government's pending Motion for Reconsideration seeks to do.

Indeed, the law of the case doctrine is applied with particular vigilance where, as here, there has been a reassignment of judges. As the Court of Claims has pointedly noted, "[c]ertainly, a reassignment to another judge should not be viewed as declaring open season on relitigating any prior rulings with which a party disagrees." *Applegate v. United States*, 52 Fed. Cl. 751, 765 (Ct. Cl. 2002) (citing *Best v. Shell Oil Co.*, 107 F.3d 544, 546 (7th Cir. 1997) (stating that the law of case doctrine "reflects the rightful expectation of litigants that a change in judges midway through a case will not mean going back to square one"); *see also United States*

2

*v. Turtle Mountain Band of Chippewa Indians*, 612 F.2d 517, 520 (Ct. Cl. 1979) ("No litigant deserves an opportunity to go over the same ground twice, hoping that the passage of time or changes in the composition of the court will provide a more favorable result the second time.").

Additionally, there is no merit to the Government's suggestion that "the law of the case doctrine only applies once a judgment or appellate decision has been rendered." Govt. Opp. at 5. In fact, quite the opposite—the Federal Circuit has expressly stated, "[t]he law of the case does not involve preclusion after final judgment, but rather it regulates judicial affairs before final judgment." *Mendenhall*, 26 F.3d at 1582 (citing Charles A. Wright, et al., Federal Practice and Procedure § 4478 (1981)).

### The Government has not established that this case falls within an exception to the doctrine.

While "[a] court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance," the Supreme Court has made it clear that "as a rule courts should be loathe to do so in the absence of extraordinary circumstances." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988). *Id.* In *Gould, Inc. v. United States*, the Federal Circuit explained that such extraordinary circumstances may exist if: (1) the evidence in a subsequent trial is substantially different; (2) controlling authority has since made a contrary decision of the law applicable to the issues; or (3) the earlier ruling was clearly erroneous and would work a manifest injustice. *Gould*, 67 F.3d at 930.

The only attempt that the Government has made to demonstrate extraordinary circumstances is its argument that the Federal Circuit's opinion in *Texas Peanut Farmers* is a "'contrary decision of the law applicable to the issues' by a 'controlling authority.'" Govt. Opp. at 6. The Federal Circuit's decision in *Texas Peanut Farmers*, however, is simply not a "contrary decision of the law applicable to the issues" as required by *Gould*. *Gould*, 67 F.3d at

3

930. *Texas Peanut Farmers* merely affirmed the decision of the Court of Federal Claims. Thus, because Judge Hodges considered and rejected the Government's argument based on the original decision in *Texas Peanut Farmers v. United States*, 59 Fed. Cl. 70 (2003), the Federal Circuit's concurrence with that decision provides no basis for revisiting this Court's prior rejection of the Government's motion to dismiss for lack of subject matter jurisdiction. In short, the Federal Circuit's opinion simply does not change anything that was not considered previously by Judge Hodges.

Nevertheless, in its Opposition, the Government argues that the "Federal Circuit's opinion went beyond merely affirming the result of this Court's dismissal for lack of subject matter jurisdiction, and specifically found that the 'plain meaning' of 7 U.S.C. § 1560(d) was that 'Congress granted district courts exclusive jurisdiction over claims against the FCIC.'" Govt. Opp. at 7 (quoting *Texas Peanut Farmers*, 409 F.3d at 1374) (emphasis added by Government). But that quotation, removed from its context, obscures the precise parameters of the holding. The actual holding was that "a suit that is *properly characterized as an action against the FCIC for breach of contract* must be brought in district court." *Id.* at n.5 (emphasis added). Thus, as Acceptance has maintained throughout this action, it is only claims in breach of contract or against the FCIC acting in its corporate capacity that must be brought in district court. As a result, the Federal Circuit's finding is simply not inconsistent with Judge Hodges' ruling that Section 1506(d) applies only to "issues that arise under the Federal Crop Insurance Act," and not to a takings claim such as this. August 13, 2004 Order at 2.

### The Court should also decline reconsideration so as not to encourage strategic delay.

Assuming, *arguendo*, that *Texas Peanut Farmers* did change anything, the Government has unreasonably delayed in bringing the case to the Court's attention. The Federal Circuit

4

issued its opinion on May 31, 2005, nearly nine months before the Government filed its renewed

motion to dismiss. The Government argues that there was no reason for it to renew its motion to

dismiss promptly and that it had always intended to renew its motion in conjunction with a

motion for summary judgment. Govt. Opp. at 8. Apparently, the Government does not believe

in the interests of efficiency and judicial economy. And, although the Government claims that it

"could not have engaged in 'judge-shopping' * * * because [it] did not request that Judge

Hodges transfer the case," Govt. Opp. at 8, the fact remains that the Federal Circuit's opinion

was issued before Judge Hodges reassigned this case, yet the Government did not bring *Texas*

*Peanut Farmers* to Judge Hodges' attention, and instead asked Judge Wheeler to do what it did

not ask Judge Hodges to do—reopen its motion to dismiss.

### 2. What is the relationship between the Risk Management Agency ("RMA") and the Federal Crop Insurance Corporation ("FCIC")?

* * *

**The RMA appears to have administrative and oversight authority over the FCIC but the agencies are deeply intertwined and their responsibilities largely coextensive.**

The FCIC was established in 1938 as a government owned corporation responsible for all

aspects of the federal crop insurance program, with both rulemaking authority and the capacity to

enter into contracts with private crop insurers, to be the source of reinsurance for private crop

insurers pursuant to standardized agreements such as the Standard Reinsurance Agreement

(SRA), and to subsidize the federal crop insurance program. The Federal Crop Insurance Act

(FCIA) describes the FCIC as a "body corporate" constituting "an agency of and within the

Department [of Agriculture]." 7 U.S.C. § 1503. The FCIA provides that the FCIC will be

managed by a Board of Directors. 7 U.S.C. § 1505. The FCIC's authority to promulgate regulations is found in 7 U.S.C. § 1506(p) and the regulations are codified at 7 C.F.R. § 1 *et seq.*

The RMA was created in 1996 pursuant to legislation reorganizing various operations of the Department of Agriculture. The section providing for the establishment of the RMA is 7 U.S.C. § 6933. That section sets out the functions of the RMA in broad terms and also contemplates interlocking management with the FCIC. The main functions of the RMA are "supervision of the Federal Crop Insurance Corporation" and "administration and oversight of all aspects * * * of all programs authorized under the Federal Crop Insurance Act." 7 U.S.C. § 6933(b). The operational interconnection between the RMA and the FCIC is established by the statutory directive that the Administrator of the RMA "shall also serve as Manager of the Federal Crop Insurance Corporation." 7 U.S.C. § 6933(c). According to the RMA website, the individual who serves as Administrator of the RMA and Manager of the FCIC also has a non-voting seat on the FCIC Board of Directors. See *www.rma.usda.gov/fcic/index.html.*

Ross Davidson testified that at the time of Acceptance's proposed sale of its crop insurance business to Rain & Hail and the government's interdiction of the sale, he was Administrator of the RMA; Manager of the FCIC; Chief Executive Officer of the FCIC; and a non-voting member of the Board of the FCIC. Davidson Depo. 9:6-23 (Pl. App. 3). Asked what is the relationship between the RMA and the FCIC, Davidson explained that the RMA was established to serve "as an overseer of the Federal Crop Insurance Corporation and the administrative manager of the affairs of [the] Federal Crop Insurance Corporation." *Id.* at 10:14-16 (Pl. App. 4). Davidson testified that there was no real demarcation between his responsibilities under his various job titles at the RMA and the FCIC, and stated that the two entities "really are alter egos of each other." *Id.* at 10-11 (Pl. App. 4).

6

The FCIC has statutory rulemaking authority, while the RMA apparently does not. Thus, all crop insurance regulations are promulgated under the aegis of the FCIC's authority and appear in the Code of Federal Regulations as regulations of the FCIC. But here too, the line of demarcation is clouded. The RMA website implies that the RMA originates rulemakings for the FCIC: "Regulations enable RMA to carry out its mission of promoting, supporting, and regulating sound risk management solutions to preserve and strengthen the economic stability of America's agricultural producers." *www.rma.usda.gov/regs.* Current proposed rules (which can be accessed from the RMA website) list the FCIC as the promulgating agency but direct public comments and requests for further information to addresses at the RMA. See, e.g., 71 Fed. Reg. 14,828 (Mar. 24, 2006) (attached hereto as Ex. 1); 71 Fed. Reg. 8,923 (Feb. 22, 2006) (attached hereto as Ex. 2).

Courts attempting to describe the relationship between the RMA and the FCIC have settled for notably vague – and not entirely consistent – descriptions. For example:

> "FCIC/RMA are agencies within the USDA that act as reinsurers of the federal crop insurance program where private insurers act to both sell and service insurance policies to farmers." *Buschkoetter v. Johanns*, 2006 WL 1479165 at *1 (D. Neb. May 24, 2006).

> "The FCIC was created to regulate the crop insurance industry and is a wholly-owned government corporation within the United States Department of Agriculture ('USDA'). Under the Federal Crop Insurance Act * * * Congress directed that crop insurance be offered through private insurance providers and reinsured (and regulated) by the FCIC which, in turn, is regulated by the USDA's Risk Management Agency ('RMA')." *Texas Peanut Farmers v. U.S.*, 409 F.3d 1370, 1372 (Fed. Cir. 2005).

> "The Federal Crop Insurance Corporation ('FCIC') reinsures the policies, and federal law defines and regulates their terms. FCIC is a federal agency established pursuant to the Federal Crop Insurance Act ('FCIA') to carry out the purposes of the FCIA. * * * The United States Department of Agriculture Risk Management Agency ('RMA') administers FCIC. For all relevant and practical

purposes, the RMA and the FCIC are one and the same." *William J. Mouren Farming, Inc. v. Great American Ins. Co.*, 2005 WL 2064129 at *1 (E.D. Cal. Aug. 24, 2005).

"Plaintiffs have named both the RMA and the FCIC as Defendants and allege that, because the RMA is the successor agency to the FCIC, it should be subject to suit [for breach of the SRA] * * *. Although the statute and regulations do not address Plaintiff's contention, the RMA's own website clearly indicates that it now administers the FCIA and that the FCIC is simply a division within the RMA. RMA Online, at *http://www.rma.usda.gov/aboutrma.*" *Rain & Hail Ins. Service, Inc. v. FCIC*, 229 F.Supp.2d 710, 714 (S.D. Tex. 2002).

One distinction between the FCIC and the RMA that appears to be fairly clear is that only

the FCIC, as a "body corporate" (7 U.S.C. § 1503), and not the RMA, which is merely an

"independent office" within the Department of Agriculture (7 U.S.C. § 6933), has legal capacity

to enter into reinsurance agreements with private crop insurers. Thus, the signatories to the SRA

are always the FCIC and the crop insurer. A necessary corollary is that in any action for breach

of the SRA, the FCIC must be named as a defendant since no action on a contract will lie without

the contractual counterparty included as a party to the action. By contrast, in a takings claim

based upon the regulatory acts of the RMA, the FCIC, or both in concert, the proper defendant is

the sovereign, the United States, and neither the RMA or the FCIC is a proper party.

### 3.  Are the actions complained of in this case the responsibility of the RMA, the FCIC, or both?

* * *

**In this takings action, the actions complained of were undertaken by the RMA but are the responsibility of the sovereign, the United States, and the liability is that of the United States.**

The principal actor in this case was the RMA, acting by and through its Administrator,

Ross J. Davidson, Jr. Correspondence written by the government to Rain & Hail and Acceptance

was signed by Mr. Davidson in his capacity as the Director of the RMA. Similarly, both Rain &

Hail and Acceptance directed their correspondence regarding the proposed transaction to Mr. Davidson in his capacity as Administrator of the RMA. See, e.g. Defendant's February 10, 2006 Appendix, Exhibit Nos. 11-15. The FCIC was not involved in assessing, analyzing or ultimately rejecting the proposed transaction. For purposes of a takings claim, however, it is immaterial whether the direct actor was the RMA, the FCIC, or both. The RMA and the FCIC are both agencies or instrumentalities of the United States and if the actions of either, or both in concert, effect a taking then the claim for just compensation under the Takings Clause runs against the United States as sovereign.

With respect to the RMA's role in this matter, according to the discovery provided by the United States, the RMA assumes responsibility for reviewing proposed bulk sales of crop insurance from one insurer to another. Ross Davidson testified that the parties to such a proposed transaction have historically presented their proposal to "RMA management." Davidson Depo. 59:1-7 (Pl. App. 16). Likewise, in the Government's answers to interrogatories (Depo. Ex. 2 (Def. App. 196)), the review process is described as being conducted by the RMA. For example, in answer to Interrogatories 10 and 12, the Government states that "RMA reviews proposed sales of books of crop insurance business from one AIP [Approved Insurance Provider] to another AIP from a number of different perspectives depending on the nature of the transaction and the proposed method of transfer." Def. App. 212, 214. The answers to interrogatories do not describe any review of such transactions by the FCIC. In addition, in its August 6, 2004 letter response to questions submitted to Mr. Davidson by Congressman Lee Terry regarding the RMA rejection of the proposed transaction, Mr. Davidson identified the RMA as the lead actor in the government's review and analysis of the proposed transaction. See, Plaintiff's March 24, 2006 Appendix, Exhibit 11. Moreover, Mr. Davidson's notes regarding the

proposed transaction are titled "Documentation of Actions taken By RMA Regarding American

Growers (AG Insolvency [)]" See, Plaintiff's March 24, 2006 Appendix, Exhibit 9. Thus, it

appears that the RMA has assumed responsibility for the review and evaluation of proposed bulk

sales of crop insurance.

Notwithstanding the foregoing, plaintiff Acceptance has been unable to identify any

explicit authority for the RMA to review or pass upon the permissibility of the bulk transfer of a

book of crop insurance. It would be possible to argue, of course, that such a function is within

the penumbral authority of the RMA to administer the federal crop insurance program in the best

interests of the public, and it seems that the RMA was assuming such authority when it stated in

its November 25, 2002 News Release that it had determined that the Acceptance/Rain & Hail

transaction as proposed "was not in the best interest of the policyholders or taxpayers and may

have adversely affected the integrity of the crop insurance program." Plaintiff's Ex. 56 to

Wagner Depo. (attached hereto as Ex. 3).

Finally, in this connection, it may be helpful to recall that the issue of which entity was

"responsible" does not have any real pertinence to a takings claim. Where the question does

have significance is in a claim for breach of contract against the FCIC for violation of the SRA.

In that context, the FCIC is acting in its proprietary capacity as a contracting party, and the

plaintiff's cause of action for breach of contract would make the claim subject to the exclusive

jurisdiction of the district courts pursuant to 7 U.S.C.§ 1506(d). But if either instrumentality, the

FCIC or the RMA, is acting in its regulatory capacity, as here, and its actions effect a taking,

Section 1506(d) does not apply and jurisdiction properly lies in this Court.

The RMA lacks the proprietary capacity to enter into contracts with private parties. It is,

as the current RMA Administrator stated in a June 15, 2006 news release, "the *regulatory body*

for the Federal crop insurance program." *www.rma.usda.gov/news/2006/06/naic.html.* Its

regulatory actions with respect to the proposed Acceptance/Rain & Hail transaction constitute a

proper basis for bringing a takings claim in this Court.

### 4. What regulations, rules, practices or contract provisions govern the agency's review of proposed transfers of Multi-Peril Crop Insurance ("MPCI") policies from one insurer to another, and which agency is responsible for this review?

\* \* \*

**The RMA has assumed regulatory authority to review such proposed transfers. There are no identifiable written regulations, rules, practices or contract provisions that govern the agency's review of bulk transfers of policies from one insurer to another.**

The RMA, as "the regulatory body for the Federal crop insurance program," assumes

responsibility for the review of such proposed transactions, and in this case conducted a review

on the basis of which it concluded that the transaction as proposed "was not in the best interest of

the policyholders or taxpayers and may have adversely affected the integrity of the crop

insurance program." See discussion of Question 3, pp. 10-11 above.

This review function is not addressed in the Federal Crop Insurance Act (7 U.S.C. § 1501

et seq.), the Code of Federal Regulations, or the statute creating the RMA (7 U.S.C. § 6933).

The RMA takes the position that the review of such a transaction flows from the fact that the

transaction must be consistent with the SRA, and that the review is effectively a review for

consistency with the SRA. *See* Davidson Depo. 60:8-11 (Pl. App. 16) (Q: "What is the result of

the agency's review of the proposed transaction?" A: "To determine if it's in agreement with

the terms of the standard reinsurance agreement."). Aside from the obvious fact that the

purchaser must have the financial wherewithal as defined in the SRA and the applicable

regulations to assume the new business,[1] it is not possible to find anything else in the SRA that
provides any explicit or implicit parameters for the RMA's review of a transaction.

The Government asserts that the SRA incorporates the provisions of the Crop Insurance
Handbook, in particular Section 4.C(9) thereof. Davidson Depo. 56:17-20 (Pl. App. 15) (the
"standard reinsurance agreement incorporates other handbooks and the Federal Crop Insurance
Act itself into its body, and so all of those things/requirements are necessary to be made"). The
alleged non-compliance with Section 4.C(9) is a central element in several of the Government's
arguments. The problem with this is that the section clearly has nothing to do with bulk transfers
from one crop insurer to another. Section 4.C is captioned "Applications for Insurance" and
deals with what an insured producer must do in order to secure coverage from an FCIC reinsured
crop insurer. Section 4.C(9) deals specifically with the situation where a person holding a policy
with one insurer wishes to switch coverage to another insurer. The process begins with a transfer
request from the insured to its current Insurance Provider. The section thus plainly deals with
individual transfers initiated by the insured. There is no discussion whatsoever of any other
scenario and the section by its terms is obviously not applicable to a bulk transfer of a book of
business initiated as part of the sale from one insurer to another of the book of business.

In sum, although one may assume that the RMA has some, at least penumbral, authority
to review sales of a book of crop insurance business from one insurer to another, there is no
readily identifiable source of standards and parameters for such review. Moreover, the Section
4.C(9) procedure for handling individual requests to switch coverage to a different provider,

---

[1]    Davidson testified at length that in this case because of the great financial strength and vast
surplus maintained by the proposed purchaser, there was no concern at all that it would not be
able to qualify. Davidson Depo. 81-83 (Pl. App. 21-22).

which the Government has inexplicably focused upon, clearly has no application in the context

of a bulk transfer to effectuate the sale of a book of business from one insurer to another.

**5. What ultimately happened to the MPCI policies at issue in this case?
Were they transferred to other insurance carriers? Did the new carrier
assume liabilities from American Growers Insurance Company? Did Plaintiff
or American Growers receive any compensation from the transfer of these
policies?**

\* \* \*

**The MPCI policies were transferred to Rain & Hail and other of
Acceptance's competitors without the new carriers assuming liabilities for
past years' losses from American Growers and without Acceptance receiving
any compensation.**

Pursuant to RMA Bulletin No.: MGR-02-022 dated December 18, 2002 (attached hereto

as Exhibit 4), following its rejection of the Acceptance/Rain & Hail transaction, the RMA

transferred, distributed or made available to Acceptance's former competitors, including Rain &

Hail, the former American Grower's crop insurance policies for which Rain & Hail had been

willing to pay in excess of $21 million. In fact, Rain & Hail received the greatest number of

American Growers' policies. Depo. Ex. 17 (Pl. App. 418); Wagner Depo. 36:7-21, 37:14-21.

(Pl. App. 380, 381).

In its Opposition, the Government disputes Acceptance's assertion that the RMA effected

a taking "because it 'distributed or made available' American Growers' MPCI policies to other

insurers after NDOI [Nebraska Department of Insurance] placed American Growers in

supervision." Govt. Opp. at 27 (quoting Pl. Opp. at 18). The Government argues that Ross

Davidson testified "that RMA did not distribute or make available American Growers' policies

to other insurers, but rather allowed policyholders to choose a new insurer." *Id.* However, the

Government makes no attempt to articulate a distinction between making policies available to

other insurers, allowing policyholders to choose a new insurer, or, as described in Bulletin No. MGR-02-022 dated December 18, 2002, authorizing the transfer of such policies, and the fact remains that by rejecting the Acceptance/Rain & Hail transaction, the Government prevented Acceptance from realizing any of the value of its assets.

As the RMA knew would happen, immediately following announcement of the RMA's decision, the Nebraska Department of Insurance, acting in concert with the RMA, placed American Growers into regulatory supervision, thus eliminating any possibility that Acceptance could sell its assets elsewhere. Wagner Depo. 35:2-13 (Pl. App. 380). The RMA took control of those policies for which Rain & Hail had been willing to pay in excess of $21.5 million and transferred them (as described in Bulletin No.: MGR-02-022 (December 18, 2002)) to Acceptance's former competitors, free of charge, without the burden of prior year liabilities, and without the obligation that the acquiring companies retain Acceptance's former agents, which it had insisted Rain & Hail accept as a condition of approval of the proposed transaction. Thus, by rejecting the proposed Acceptance/Rain & Hail transaction, the Government afforded itself the opportunity to consummate a transaction virtually identical to the transaction proposed between Acceptance and Rain & Hail. The only difference is that under the proposed transaction, Acceptance stood to receive between $21.5 million and $70 million. Instead, due to RMA's rejection, it received $0 and the Government relieved itself – at Acceptance's expense – of the potential liability it feared would result from its approval of the proposed transaction. In effect, Acceptance "paid" more than $21.5 million to eliminate the Government's litigation risk.

The Government claims that it rejected the transaction as proposed because: (1) the proposal contemplated the bulk transfer of a large portfolio of policies without requiring each policyholder to sign a transfer form pursuant to Section 4.C(9) of the FCIC Crop Insurance

14

Handbook, the requirements of which the RMA would not waive; (2) Rain & Hail intended to purchase the business on a going forward basis only, without taking on prior year liabilities; and (3) Rain & Hail might have elected not to assume all of Acceptance's agency contracts. Yet the regulatory action in rejecting the transaction led to a virtually identical result. Following the rejection, the Government (1) transferred or made available Acceptance's in-force policies to other crop insurers, principally Rain & Hail, without requiring the new insurers to accept prior year liabilities, (2) relieved producers of the obligation to comply with Section 4.C(9) if the closing date for their policies had already closed (as it had for the in-force policies), and (3) allowed the new insurers to select their own agents -- and eliminating the perceived litigation risk for RMA. In short, the Government, motivated by the public purpose of avoiding potential litigation exposure, brought about the same results that it rejected -- except that Acceptance received nothing, rather than between $21.5 million and $70 million it would have received from Rain & Hail.

**6. Is Plaintiff required to exhaust its administrative remedies before the Department of Agriculture Board of Contract Appeals, pursuant to 7 U.S.C. § 6912(e) and 7 C.F.R. § 400.169(a), (d), prior to filing suit in this Court?**

\* \* \*

**Acceptance is not required to exhaust administrative remedies before bringing this Fifth Amendment takings claim, and there are no administrative remedies to exhaust. The Department of Agriculture has not been delegated authority to adjudicate takings claims or order "just compensation" under the Fifth Amendment.**

The Government's argument that this suit cannot be maintained because Acceptance has failed to exhaust administrative remedies under Department of Agriculture statutes and regulations fails because there are no applicable administrative remedies that Acceptance is

15

required to exhaust,[2] see Plaintiff's March 9, 2004 Opposition to the Government's original Motion to Dismiss at 6-11 and in Plaintiff's March 24, 2006 Consolidated Motion for Summary Judgment and Response in Opposition to Defendant's Renewed Motion to Dismiss or for Summary Judgment, The administrative remedies created pursuant to 7 U.S.C. § 6912(e) and 7 C.F.R. § 400.169(a) and (d) apply only to matters relating to the FCIC's reinsurance obligations arising under the Standard Reinsurance Agreement.

Quite clearly, the claims asserted by Acceptance do not pertain to coverage under a reinsurance contract. Rather, Acceptance presents a Fifth Amendment takings claim based on the United States' actions in preventing Acceptance from selling its in-force crop insurance business and other insurance-related assets, and thereby obtaining value for its assets, including payment of at least $21.5 million in cash under the terms of the signed letter of intent with Rain & Hail. This case, which concerns the Government's actions in derogation of the right of an individual to sell and receive value for its assets, has nothing to do with disputing the amount of reinsurance coverage available under an SRA.

The Government's Renewed Motion to Dismiss does not even attempt to distinguish *National Crop Insurance. Servs. v. FCIC,* 351 F.3d 346 (8th Cir. 2003), wherein the Eighth Circuit reversed and remanded *In re 2000 Sugar Beet Crop Ins. Litigation,* 228 F. Supp. 2d 999 (D. Minn. 2002), a case relied on by the Government in its original Motion to Dismiss. Such omission is clearly by design, as *National Crop Insurance* makes it clear that Defendant's exhaustion argument lacks merit. In that case, the Eighth Circuit held that the mandatory administrative appeals process afforded under agency regulations is limited in scope to only cases pertaining to coverage under an FCIC reinsurance contract. Specifically, the regulations

---

[2]    Moreover, the Court has already considered and rejected the Government's virtually identical argument. *See* August 13, 2004 Order.

"require administrative appeals when a dispute between an insurance provider and the FCIC

*pertains to coverage under a reinsurance contract.*" *Id.* at 349 (emphasis added). Since the case

before the court in *National Crop Insurance* was "not such a dispute," there was no requirement

to exhaust administrative remedies and the insurer was entitled to bring the matter directly before

the district courts. *Id.* Like the claims considered in *National Crop Insurance*, the claims

asserted by Acceptance have nothing to do with coverage under a reinsurance contract.

Although, Defendant has ignored *National Crop Insurance*, that decision accurately

delineates the scope of the administrative appeals process established in the regulations as

limited to disputes concerning coverage under a reinsurance contract. In those cases, and only in

those cases, there are two levels of administrative review, *see* 7 C.F.R. § 400.169(a) and (d), and

both are limited to disputes concerning reinsurance contracts. Section 400.169(a) sets forth the

first level of agency appeal and defines its scope:

> (a) If the company believes that the [FCIC] has taken an action that is not
> in accordance with the provisions of the Standard Reinsurance Agreement,
> or any reinsurance agreement with the FCIC, except compliance issues, it
> may request the Deputy Administrator of Insurance Services to make a
> final administrative determination addressing the disputed action.

Thus, the kinds of actions that may be appealed under this section are those that deal with

the FCIC's obligations arising under the provisions of the reinsurance agreement, such as

disputes as to the amount of indemnification and the like. In effect, the matter disputed must be

in the nature of a breach of contract by the FCIC, because it must be premised upon an action by

the FCIC that is "not in accordance with the provisions" of the contract. The appeal procedure is

essentially designed to give the insurer a means of enforcing the terms of the reinsurance

agreement.

If the Deputy Administrator's "final administrative determination" in matters involving

disputes over the reinsurance agreement is adverse to the company, the company may, under

Section 400.169(d), seek a second level of review by the Board of Contract Appeals:

> (d) Appealable final administrative determinations * * * under paragraph (a) or (b) of this section may be appealed to the Board of Contract Appeals in accordance with the provisions of subtitle A, part 24 of title 7 of the Code of Federal Regulations.

The section setting forth the Board of Contract Appeals' jurisdiction, 7 C.F.R. § 24.4(b),

makes it clear that the scope of cases appealable to the Board are those pertaining to the FCIC's

contractual obligations, exactly as stated in Section 400.169: "The Board shall have jurisdiction

of appeals of final administrative determinations * * * pertaining to standard reinsurance

agreements under 7 C.F.R. § 400.169(d)." Thus, at each level of the administrative appeal

process, the category of cases subject to that process is explicitly circumscribed. The

administrative appeal process must only be traversed when the basis of the claim is the FCIC's

failure to fulfill its contractual obligations under the reinsurance contract. This Fifth Amendment

takings claim against the United States, based upon the FCIC's interdiction of the sale of

Acceptance's in-force business and other insurance-related assets, does not fall within the

parameters of the agency appeal proceedings designed for FCIC reinsurance contract disputes

and would not be a claim cognizable in such proceedings.

The Government's renewed motion to dismiss presents only one case not addressed in its

original motion to support the proposition that 7 U.S.C. § 6912(e) mandates exhaustion of

administrative remedies as a prerequisite to filing this suit, *ACE Property & Casualty Co. v.*

*United States*, 60 Fed. Cl. 175, 184 (2004). *Compare* Govt. Orig. Mot. at 8-10 *with* Govt. Mot.

at 15-18. However, like the other cases relied on by the Government, *ACE Property* involved

claims that sought to address a breach of the SRA. *See ACE Prop.*, 60 Fed. Cl. at 176; *see also*

*Rain & Hail Ins. Serv., Inc. v. FCIC*, 229 F. Supp. 2d 710 (S.D. Tex. 2002) (holding that administrative appeal under Section 400.169(a) and (d) was required where the plaintiff crop insurer was seeking damages for breach of contract under the SRA); *Farmers Alliance Mut. Ins. Co. v. FCIC*, No. 00-2347-JWL, 2001 WL 30443 (D. Kan., Jan. 3, 2001) (finding an action for breach of the SRA subject to the Section 400.169 review process); *American Growers Ins. Co. v. FCIC*, 210 F. Supp. 2d 1088 (S.D. Iowa 2002) (using prescribed administrative procedure for review of the breach of contract claims against the FCIC for violation of the SRA).

Since this case is not an action against the FCIC to enforce the provisions of the SRA or to redress the breach of those provisions, it is outside the purview of the limited review procedure established under 7 C.F.R. § 400.169, and Acceptance was not required to seek recourse through that procedure. Consequently, this case is not subject to the exhaustion requirement of 7 U.S.C. § 6912(e) because, for this case, there is no administrative appeal procedure to be exhausted.

Finally, as a number of courts have recognized, exhaustion of administrative remedies is not required where there is no administrative remedy available. *See, e.g., Crowley v. United States*, 56 Fed. Cl. 291, 296 (Ct. Cl. 2003) (noting that "the administrative remedy may be inadequate because, even if an agency can adjudicate the issue presented, it may not have authority to grant the type of relief requested") (citing *McNeese v. Bd. of Ed. for Cmty. Unit Sch. Dist. 187*, 373 U.S. 668, 675 (1963) (finding that student plaintiffs did not have to exhaust administrative remedies when the school superintendent did not have authority to grant the requested relief); *Cristina Inv. Corp. v. United States*, 40 Fed. Cl. 571, 579 (Ct. Cl. 1998) ("Challenges to overturn a government denial [are] not required to ripen a takings claim...because the success of such challenges would not afford the takings plaintiff the relief of

19

just compensation that he seeks.") (citing *Williamson County Regional Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 193 (1985)).

Dated: June 26, 2006                    Respectfully submitted,

                                        _____
                                        Lewis S. Wiener, Esq.
                                        SUTHERLAND ASBILL & BRENNAN LLP
                                        1275 Pennsylvania Avenue, NW
                                        Washington, D.C.  20004
                                        202.383.0140 - phone
                                        202.637.3593 - fax
                                        Counsel for Plaintiff Acceptance Insurance
                                        Companies Inc.

OF COUNSEL:
Ronald Massumi
Carter Williams
SUTHERLAND ASBILL & BRENNAN LLP
1275 Pennsylvania Avenue, NW
Washington, D.C.  20004
202.383.0100

Patrick Griffin
Kutak Rock, LLP
The Omaha Building
1650 Farnam Street
Omaha, NE 68102-2186
402.346.6000

**EXHIBIT 1**

**TO**

**PLAINTIFF'S RESPONSE TO QUESTIONS
PROPOUNDED IN THE COURT'S ORDER OF JUNE 14, 2006**

**14828**    Federal Register / Vol. 71, No. 57 / Friday, March 24, 2006 / Proposed Rules

AGRICULTURAL MARKETING SERVICE REVIEW PLAN FOR REGULATIONS IDENTIFIED FOR SECTION 610 REVIEW REGULATORY FLEXIBILITY ACT—Continued

| CFR part & authority | AMS program/regulation | Year implemented | Year for review |
|---|---|---|---|
| 7 Part 929; 7 U.S.C. 601–674 ......................................... | Cranberries Grown in States of Massachusetts, Rhode Island, etc. | 1962 ............. | *2005 |
| 7 Part 930; 7 U.S.C. 601–674 ......................................... | Tart Cherries Grown in MI, NY, PA, OR, UT, WA & WI | 1996 ............. | 2006 |
| 7 Part 948; 7 U.S.C. 601–674 ......................................... | Irish Potatoes Grown in Colorado ................................ | 1941 ............. | 2006 |
| 7 Part 966; 7 U.S.C. 601–674 ......................................... | Tomatoes Grown in Florida ......................................... | 1955 ............. | 2008 |
| 7 Part 984; 7 U.S.C. 601–674 ......................................... | Walnuts Grown in California ....................................... | 1948 ............. | 2008 |
| 7 Part 996; Secs. 1308, Pub.L. 107–171, 116 Stat. 178 (7 U.S.C. 7958). | Minimum Quality and Handling Standards for Domestic and Imported Peanuts Marketed in the United States. | 2003 ............. | 2010 |
| 7 Parts 1000–1139; 7 U.S.C. 601–674 ........................... | Federal Milk Marketing Orders .................................... | 1999 ............. | 2009 |
| 7 Part 1150; 7 U.S.C. 4501–4513 ................................... | Dairy Promotion Program ........................................... | 1984 ............. | 2006 |
| 7 Part 1206; 7 U.S.C. 7411–7425 .................................. | Mango Promotion, Research, and Promotion Order ...... | 2004 ............. | 2014 |
| 7 Part 1207; 7 U.S.C. 2611–2627 ................................... | Potato Research and Promotion .................................. | 1972 ............. | *2005 |
| 7 Part 1209; 7 U.S.C. 6101–6112 ................................... | Mushroom Promotion, Research and Consumer Information Order. | 1993 ............. | *2005 |
| 7 Part 1215; 7 U.S.C. 7481–7491 ................................... | Popcorn Promotion, Research and Consumer Information. | 1997 ............. | 2007 |
| 7 Part 1216; 7 U.S.C. 7401–7425 ................................... | Peanut Promotion, Research, and Information Order .... | 1999 ............. | 2009 |
| 7 Part 1218; 7 U.S.C. 7401–7425 ................................... | Blueberry Promotion, Research, and Information Order | 2000 ............. | 2010 |
| 7 Part 1219; 7 U.S.C. 7801–7813 ................................... | Hass Avocado Promotion, Research, and Information .. | 2003 ............. | 2010 |
| 7 Part 1220; 7 U.S.C. 6301–6311 ................................... | Soybean Promotion, Research and Consumer Information. | 1991 ............. | *2005 |
| 7 Part 1230; 7 U.S.C. 4801–4819 ................................... | Pork Promotion, Research, and Consumer Information | 1986 ............. | 2008 |
| 7 Part 1240; 7 U.S.C. 4601–4612 ................................... | Honey Research, Promotion, and Consumer Information Order. | 1987 ............. | 2008 |
| 7 Part 1250; 7 U.S.C. 2701–2718 ................................... | Egg Research and Promotion ...................................... | 1976 ............. | *2005 |
| 7 Part 1260; 7 U.S.C. 2901–2911 ................................... | Beef Promotion and Research ..................................... | 1986 ............. | 2007 |

* A notice was published in the **Federal Register** announcing this review. The agency expects to publish a summary later this year.

[FR Doc. 06–2896 Filed 3–23–06; 8:45 am]
BILLING CODE 3410–02–P

## DEPARTMENT OF AGRICULTURE

**Federal Crop Insurance Corporation**

**7 CFR Part 457**

**RIN 0563–AC03**

**Common Crop Insurance Regulations; Mint Crop Insurance Provisions**

**AGENCY:** Federal Crop Insurance Corporation, USDA.

**ACTION:** Correction; Reopening and Extension of comment period.

**SUMMARY:** The Federal Crop Insurance Corporation (FCIC) is extending the comment period for the proposed rule that was published in the **Federal Register** on Monday, February 6, 2006 [71 FR 6016–6021]. The proposed rule was to amend 7 CFR part 457 to add to a new § 457.169 that provides insurance for mint. The provisions will be used in conjunction with the Common Crop Insurance Policy Basic Provisions, which contain standard terms and conditions common to most crops. This action will correct the electronic mail address, and allow interested persons additional time to prepare and submit comments.

**DATES:** Written comments and opinions on this proposed rule will be accepted until close of business April 24, 2006, and will be considered when the rule is to be made final.

**ADDRESSES:** Interested persons are invited to submit written comments to the Director, Product Development Division, Risk Management Agency, United States Department of Agriculture, 6501 Beacon Drive, Stop 0812, Room 421, Kansas City, MO 64133–4676. Comments titled "Mint Crop Insurance Provisions" may be sent via the Internet to *DirectorPDD@rma.usda.gov*, or the Federal eRulemaking Portal: *http://www.regulations.gov/*. Follow the online instructions for submitting comments. A copy of each response will be available for public inspection and copying from 7 a.m. to 4:30 p.m., c.s.t., Monday through Friday, except holidays, at the above address.

**FOR FURTHER INFORMATION CONTACT:** Linda Williams, Risk Management Specialist, Research and Development, Product Development Division, Risk Management Agency, at the Kansas City, MO, address listed above, telephone (816) 926–7730.

**SUPPLEMENTARY INFORMATION:**

## Background

On Monday, February 6, 2006, FCIC published a proposed rule with request for comments in the **Federal Register** to add to 7 CFR part 457, the Common Crop Insurance Regulations, a new § 457.169 that will provide insurance for mint. The effect of the proposed rule was to convert the mint pilot crop insurance program to a permanent crop insurance program.

Comments were required to be received on or before April 7, 2006. FCIC has been informed the e-mail address listed on the proposed rule and the Federal eRulemaking Portal address were not operational at the time the proposed rule was published. Therefore, FCIC is reopening and extending the comment period until close of business April 24, 2006. This action will allow interested persons who were unable to submit comments additional time to submit comments.

Signed in Washington, DC on March 16, 2006.

**Eldon Gould,**

*Manager, Federal Crop Insurance Corporation.*

[FR Doc. 06–2893 Filed 3–23–06; 8:45 am]
BILLING CODE 3410–08–P

**EXHIBIT 2**

**TO**

**PLAINTIFF'S RESPONSE TO QUESTIONS
PROPOUNDED IN THE COURT'S ORDER OF JUNE 14, 2006**

Federal Register / Vol. 71, No. 35 / Wednesday, February 22, 2006 / Rules and Regulations    **8923**

[FR Doc. 06–1606 Filed 2–21–06; 8:45 am]
BILLING CODE 6325–39–P

## DEPARTMENT OF AGRICULTURE

### Federal Crop Insurance Corporation

### 7 CFR Part 457

### RIN 0563–AC07

### Common Crop Insurance Regulations, Basic Provisions

**AGENCY:** Federal Crop Insurance Corporation, USDA.

**ACTION:** Interim rule; reopening and extension of comment period.

**SUMMARY:** The Federal Crop Insurance Corporation (FCIC) is reopening and extending the comment period for the interim rule that was published in the **Federal Register** on Wednesday, November 30, 2005 (70 FR 71749–71751). The interim rule amended the Common Crop Insurance Regulations, Basic Provisions to implement the requirements of section 780 of the Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act, 2006 (2006 Appropriations Act) regarding written agreements and the use of similar agricultural commodities. This action will allow interested persons additional time to prepare and submit comments.

**DATES:** Written comments and opinions on this interim rule will be accepted until close of business March 24, 2006 and will be considered when the rule is to be made final.

**ADDRESSES:** Interested persons are invited to submit written comments to the Director, Product Development Division, Risk Management Agency, United States Department of Agriculture, 6501 Beacon Drive, Stop 0812, Room 421, Kansas City, MO 64133–4676. Comments titled "Basic Provisions Interim Rule" may also be sent via the Internet to *DirectorPDD@rma.usda.gov*, or the Federal eRulemaking Portal: *http://www.regulations.gov/*. Follow the online instructions for submitting comments. A copy of each response will be available for public inspection and copying from 7 a.m. to 4:30 p.m., c.s.t., Monday through Friday, except holidays, at the above address.

**FOR FURTHER INFORMATION CONTACT:** For further information contact Erin Reid, Risk Management Specialist, Research and Development, Product Development Division, Risk Management Agency, at

the Kansas City, MO, address listed above, telephone (816) 926–7730.

**SUPPLEMENTARY INFORMATION:**

### Background

On Wednesday, November 30, 2005, FCIC published an interim rule with request for comments in the **Federal Register** proposing changes to the Common Crop Insurance Regulations, Basic Provisions to implement program changes mandated by the 2006 Appropriations Act.

Comments were required to be received on or before January 30, 2006. FCIC believes the email address listed on the interim rule and the Federal eRulemaking Portal address were not operational during that time period. Therefore, interested persons could not provide comment. Therefore, FCIC is reopening and extending the comment period until close of business March 24, 2006. This action will allow interested persons who were unable to submit comments additional time to submit comments.

Signed in Washington, DC on February 14, 2006.

**Eldon Gould,**

*Manager, Federal Crop Insurance Corporation.*

[FR Doc. 06–1581 Filed 2–21–06; 8:45 am]
BILLING CODE 3410–08–P

## DEPARTMENT OF AGRICULTURE

### Agricultural Marketing Service

### 7 CFR Part 989

### [Docket No. FV06–989–1 IFR]

### Raisins Produced From Grapes Grown in California; Decreased Assessment Rate

**AGENCY:** Agricultural Marketing Service, USDA.

**ACTION:** Interim final rule with request for comments.

**SUMMARY:** This rule decreases the assessment rate established for the Raisin Administrative Committee (Committee) for the 2005–06 and subsequent crop years from $11.00 to $7.50 per ton of free tonnage raisins acquired by handlers, and reserve tonnage raisins released or sold to handlers for use in free tonnage outlets. The Committee locally administers the Federal marketing order which regulates the handling of raisins produced from grapes grown in California (order). Assessments upon raisin handlers are used by the Committee to fund reasonable and necessary expenses of the program. The crop year runs from

August 1 through July 31. The assessment rate will remain in effect indefinitely unless modified, suspended, or terminated.

**DATES:** February 23, 2006. Comments received by April 24, 2006 will be considered prior to issuance of a final rule.

**ADDRESSES:** Interested persons are invited to submit written comments concerning this rule. Comments must be sent to the Docket Clerk, Marketing Order Administration Branch, Fruit and Vegetable Programs, AMS, USDA, 1400 Independence Avenue SW., STOP 0237, Washington, DC 20250–0237; Fax: (202) 720–8938; E-mail: *moab.docketclerk@usda.gov*; or Internet: *http://www.regulations.gov*. Comments should reference the docket number and the date and page number of this issue of the **Federal Register** and will be available for public inspection in the Office of the Docket Clerk during regular business hours, or can be viewed at: *http://www.ams.usda.gov/fv/moab.html*.

**FOR FURTHER INFORMATION CONTACT:** Rose Aguayo, Marketing Specialist, California Marketing Field Office, Marketing Order Administration Branch, Fruit and Vegetable Programs, AMS, USDA; Telephone: (559) 487–5901, Fax: (559) 487–5906; or George Kelhart, Technical Advisor, Marketing Order Administration Branch, Fruit and Vegetable Programs, AMS, USDA, 1400 Independence Avenue SW., STOP 0237, Washington, DC 20250–0237; Telephone: (202) 720–2491, Fax: (202) 720–8938.

Small businesses may request information on complying with this regulation by contacting Jay Guerber, Marketing Order Administration Branch, Fruit and Vegetable Programs, AMS, USDA, 1400 Independence Avenue SW., STOP 0237, Washington, DC 20250–0237; Telephone: (202) 720–2491, Fax: (202) 720–8938, or E-mail: *Jay.Guerber@usda.gov*.

**SUPPLEMENTARY INFORMATION:** This rule is issued under Marketing Agreement and Order No. 989 (7 CFR part 989), both as amended, regulating the handling of raisins produced from grapes grown in California, hereinafter referred to as the "order." The marketing agreement and order are effective under the Agricultural Marketing Agreement Act of 1937, as amended (7 U.S.C. 601–674), hereinafter referred to as the "Act."

The Department of Agriculture (USDA) is issuing this rule in conformance with Executive Order 12866.

This rule has been reviewed under Executive Order 12988, Civil Justice

**EXHIBIT 3**

**TO**

**PLAINTIFF'S RESPONSE TO QUESTIONS
PROPOUNDED IN THE COURT'S ORDER OF JUNE 14, 2006**



# NEWS RELEASE

United States Department of Agriculture • Office of Communications • News Distribution Room 480-A
1400 Independence Avenue, SW • Washington, DC 20250-1360 • Internet: news@usda.gov
Voice: (202) 720-9035 • World Wide Web: http://www.usda.gov

## RISK MANAGEMENT AGENCY PROGRAM ANNOUNCEMENT

Eric Edgington (202) 690-2539
Eric_Edgington@wdc.usda.gov

### USDA's RISK MANAGEMENT AGENCY GUARANTEES PAYMENTS

WASHINGTON, Nov. 25 –USDA officials today announced actions taken to assure producers that crop insurance payments and services will continue despite the failure of an insurance company. The risk management tools available to American's producers are delivered by 18 private insurance companies and USDA's Risk Management Agency (RMA) acts as regulator and reinsurer.

Acceptance Insurance Companies, Inc., the parent company of American Growers Insurance Co., one of the Federal crop insurance providers, recently announced a $131 million loss. The Nebraska Department of Insurance, the state regulator for American Growers, recently issued an Order of Supervision to guarantee the safe and continuing operation of American Growers. RMA is moving expeditiously in concert with the Nebraska Department of Insurance and company management to ensure that all outstanding policy claims and service will continue uninterrupted.

Administrator Ross J. Davidson said today, "Our goal is to have all claims paid in-full and on time." Producers insured by American Growers Insurance Company will continue to receive payments and service by the company on all their Federal crop insurance policies.

Davidson also stated that RMA is devoting as many resources as needed to ensure a timely resolution of all 2002 claims. RMA has dispatched a review team to American Growers' headquarters to monitor and review their operations. "Service to producers will not be disrupted," Davidson said. Further, RMA will announce plans for the transfer of American Growers' 2003 crop year book of business and will guarantee that all policyholders will be provided crop insurance coverage.

During this transition, "It is critical that service to the producer is seamless and the integrity of the insurance program is upheld," Davidson said. The recent Order of Supervision issued by the Nebraska Department of Insurance will ensure a smooth transition of the business by allowing Nebraska to exercise appropriate oversight over the operations of American Growers as they continue to service all policyholders. Equally important is USDA's reinsurance role which guarantees that all Federal crop insurance claims will be paid timely. RMA will work closely with the Nebraska Department of Insurance and American Growers to maintain normal business operations during this transition.

Rain and Hail L.L.C. entered into a non-binding letter of intent with American Growers to obtain their 2003 book of business. However, Rain and Hail conditioned their offer upon RMA's agreement to waive certain procedures. RMA determined that such a waiver was not in the best interest of the policyholders or taxpayers and may have adversely affected the integrity of the crop insurance program.

American Growers is a private insurance company that is reinsured by the Federal Crop Insurance Corporation (FCIC) and authorized to provide crop insurance to producers.

Exhibit No. 34
Date 11-1-05
No. of Pgs.

Producers with questions or problems should contact their agent or American Growers at 1-800-999-7475. Davidson also indicated that should problems persist, producers should contact RMA at 1-800-205-9953.

#

Case 1:03-cv-02794-TCW    Document 66    Filed 06/26/2006    Page 28 of 33

**EXHIBIT 4**

**TO**

**PLAINTIFF'S RESPONSE TO QUESTIONS
PROPOUNDED IN THE COURT'S ORDER OF JUNE 14, 2006**



**USDA**

United States Department of Agriculture
Farm and Foreign Agricultural Services
Risk Management Agency

December 18, 2002

**BULLETIN NO.: MGR-02-022**

To:  All Reinsured Companies
     All RMA Field Offices
     All Other Interested Parties

From:  Ross J. Davidson Jr., Administrator   /s/ Ross J. Davidson, Jr.

Subject:  Procedure for Transferring Crop Policies Written Under the 2003 Standard Reinsurance
          Agreement from American Growers Insurance Company, and Its Policy-Issuing Companies

**BACKGROUND:**

Due to the action taken by the Nebraska Department of Insurance with regard to the financial problems
experienced by the American Growers Insurance Company, a wholly owned subsidiary of Acceptance
Insurance Companies, Inc., it is necessary to transfer existing Federally-reinsured policies to other
approved insurance providers (AIPs). The procedure for these transfers is described below.
Additional guidance will be provided if necessary.

**ACTION:**

This procedure covers all Federally-reinsured policies written by American Growers Insurance
Company and its policy-issuing companies (collectively called Growers) under any of the following
2003 reinsurance agreements: the Standard Reinsurance Agreement (SRA), the Aquacultural Standard
Reinsurance Agreement (AqSRA), and the Livestock Price Reinsurance Agreement (LPRA):

   a. With sales closing dates between July 1, 2002, and November 30, 2002, including policies with
      extended sales periods (e.g., nursery, certain citrus trees) that were sold or renewed during this
      period and excluding raisin policies with a July 31, 2002, sales closing date (hereinafter the
      "2003 fall book of business");

   b. With sales closing dates between December 1, 2002, and June 30, 2003.



**RMA**

1400 Independence Ave., SW . Stop 0801 . Washington, DC 20250-0805

The Risk Management Agency Administers and Oversees
All Programs Authorized Under the Federal Crop Insurance Corporation

An Equal Opportunity Employer

**BULLETIN NO.: MGR-02-022**                                          2

## A. Agents

Growers will notify its agents that all Growers policies must be placed with another AIP in accordance with this Bulletin. These agents will have the primary opportunity and responsibility to transfer policies included in Growers 2003 fall book of business and the 2003 remaining book of business.

## B. 2003 Fall Book of Business

The transfer process for Growers policies for the 2003 fall book of business is described below.

1. Since the cancellation date has already passed, policies cannot be canceled for the 2003 crop year. Policies will be transferred without cancellation and the assuming AIP must send a confirmation of coverage/schedule of insurance with the new assuming AIP information.

2. Only the current agent of record will have the authority to transfer policies to another AIP. Agents may only transfer Growers policies once and only to one AIP.

3. The assuming AIP should make premium estimates of policies transferred, referencing its own similar policy premium amounts or using other similar estimation methods, to monitor the amount of premium that it has been approved to write in its Plan of Operation. If the assuming AIP has reached the limitations of the amount of insurance it may write, the AIP may request the approval of RMA to increase the amount of premium that can be written under terms of the applicable reinsurance agreement.

4. For the 2003 reinsurance year only, any policy transferred may be designated to the Assigned Risk Fund, without counting against the Assigned Risk Fund maximum cession limitations. For the 2004 and subsequent reinsurance years, the Assigned Risk Fund maximum cession limitation will apply.

5. All appointments of agents and the transfer of their associated policies (B.1.) to a new AIP must be completed by January 31, 2003.

6. The assuming AIP must designate all policies transferred to a reinsurance fund by March 8, 2003. Any policies not designated by March 8, 2003, will be placed in the Commercial Fund in accordance with the SRA.

7. The reductions in administrative and operating expense subsidy contained in section V.B.11 of the SRA will not apply to the 2003 fall book of business.

8. The reductions in administrative and operating expense subsidy contained in section III.G. of the SRA will not apply to the 2003 fall book of business.

9. For tracking and control purposes, the assuming AIP's must transmit the following information to RMA via the Data Acceptance System (DAS):

   a. The previous Growers' policy number identified on the Type 9 and Type 14 records.

   b. A late processed flag of 8 must be included on the Type 14 record for these policies.

**BULLETIN NO.: MGR-02-022**                                                                    3

10. The assuming AIP may rely on all information contained on Growers policy forms (both original and electronic) to establish policies within its systems whether or not such information has been processed through RMA. RMA will work with AIP's to facilitate the availability of information for Growers policies to assist in the transfer process.

11. Unless the change was submitted to the agent prior to the applicable sales closing date, the following policy elections may not be changed during the transfer process:

    a.  Coverage level;

    b.  Price election;

    c.  Plan of insurance;

    d.  Coverage options and endorsements; and

    e.  Other elections such as yield adjustments.

12. The assuming AIP must honor and timely process approved written agreements, assignments of indemnities, transfers of right to indemnities and exclusions (e.g., high-risk land and hail/fire exclusions). Growers and RMA will provide all available evidence of such documents or agreements upon request and the assuming AIP will be entitled to fully rely upon such evidence. Agents and producers will be responsible for informing the AIP of any Growers' payment agreements in force.

13. With respect to Growers Livestock policies, the liability associated with any Livestock Risk Protection (LRP) and Livestock Gross Margin (LGM) policies in effect as of November 22, 2002, will remain with Growers. If a producer wishes to insure additional livestock under either LRP or LGM during the remainder of the crop year, a new policy must be written with a new AIP. RMA will lift the duplicate-policy block in its data systems to allow livestock policies to be written by the new AIP.

## C.  2003 Remaining Book of Business

The transfer process for the Growers 2003 remaining book of business is described below.

1.  Producers can transfer their policies to any AIP by the sales closing date for the insured crop. In accordance with section II.A.2 of the SRA, the AIP must accept all eligible producers who transfer their policies to the AIP.

2.  Since the cancellation dates for the 2003 remaining book of business have not passed, all policies included in the 2003 remaining book of business must be transferred in accordance with the procedures outlined in Section 4, Par. C(9) of the 2003 Crop Insurance Handbook (CIH). Growers will continue to handle transfer requests.

3.  Policies must be transmitted to RMA with the previous Growers policy number identified on the Type 14 record for tracking and control purposes. Such policy number will be provided to the assuming AIP from Growers and/or the agent. For policies that were transferred to Growers for the 2003 crop year, the one-transfer limitation will not apply.

**BULLETIN NO.: MGR-02-022**                                                   4

    4. All deadlines and provisions of the 2003 SRA apply, including fund designations and the transmission of all data to RMA.

    5. The assuming AIP should make premium estimates of policies transferred, referencing its own similar policy premium amounts or using other similar estimation methods, to monitor the amount of premium that it has been approved to write in its Plan of Operation. If the assuming AIP has reached the limitations of the amount of insurance it may write, the AIP may request the approval of RMA to increase the amount of premium that can be written under terms of the applicable reinsurance agreement.

**D.  Process for policies not voluntarily transferred to a new AIP**

    1. Any Growers policy not transferred under section B. above will be assigned by RMA on a random basis, on or about March 1, 2003, to an AIP that is currently writing the plan of insurance in the applicable State.

    2. Any Growers policy not transferred under section C above will be assigned by RMA on a random basis, on or about May 1, 2003, for the remaining book of business, to an AIP that is currently writing the plan of insurance in the applicable State.

    3. If a Growers policy covers more than one crop, all crops under the policy not previously transferred will be assigned to the same AIP. If other policies for that producer exist, RMA will attempt to assign all such policies with the same tax ID to the same AIP.

    4. RMA will electronically notify AIPs of the transfer and the assuming AIP must advise the policyholder of the action.

    5. AIPs must accept the transfer unless the premium would exceed the amount that the AIP is approved to write. The assuming AIP should make premium estimates of policies transferred, referencing its own similar policy premium amounts or using other similar estimation methods, to monitor the amount of premium that it has been approved to write in its Plan of Operation. AIPs will have 5 business days to notify RMA if they are unable to accept an assigned transfer because the premium would exceed the AIP's underwriting capacity. If the assuming AIP has reached the limitation of the amount of insurance it may write, the AIP may request the approval of RMA to increase the amount of premium that can be written under terms of the applicable reinsurance agreement.

    6. AIPs will be allowed to designate assigned policies to a reinsurance fund by the transaction cut-off date for the week containing the 30th day after the transfer date from RMA.

    7. There will be no reduction in administrative and operation expenses (A&O) as contained in section V.B.11 of the SRA. The reductions in administrative and operating expense contained in section III.G. of the SRA will apply using the later of the transaction cut-off date for the twelfth week after the applicable acreage reporting date or the transaction cut-off date for the twelfth week after the transfer date from RMA.

**BULLETIN NO.: MGR-02-022**                                                    5

### E. Notices of loss and claims for indemnity.

1. Growers will continue to service:

    a. Its crop and aquaculture policies for the 2002 reinsurance year.

    b. Its crop, and aquaculture policies for the 2003 reinsurance year until transferred in accordance with sections B, C or D above (except as described in E. 2).

    c. Its livestock policies for the 2003 reinsurance year.

2. In cases where claims for all units within the crop policy have been finalized for the 2003 reinsurance year, Growers will complete processing these claims for these policies.

3. In cases where claims have NOT been finalized for ALL units within the crop policy for the 2003 reinsurance year, the crop policy must be transferred to an assuming AIP who will be responsible for all claims and related service activities on such crop policies.

### F. Insurance premiums and fees due for the 2002 reinsurance year.

1. Insureds must timely pay all premiums and fees due under Growers policies for all years, including the 2002 reinsurance year to Growers.

2. Insureds will be ineligible to continue to participate in the Federal crop insurance program if premium and fees are not paid by the applicable termination date.

3. Ineligibility will continue for subsequent years until the debt is paid in accordance with 7 C.F.R. part 400 subpart U and section 2(e) of the Common Crop Insurance Policy Basic Provisions.

4. Agents are to be reminded that they may be held liable by policyholders who may be declared ineligible because of the agent's failure to submit, in a timely manner, all premiums and fees received from producers on behalf of Growers.

### G.  Administrative & Operating Subsidies

Except in circumstances covered under section E.2. of this bulletin, 2003 reinsurance year A&O subsidies will be paid in full to the assuming AIP.  Agent commissions will be paid by the assuming AIP under the assuming AIP's commission schedule.

ECF
DOCUMENT

A TRUE COPY
TEST:      SEP 2 2 2006
BRIAN BISHOP
Clerk,
U.S. Court of Federal Claims
By
Deputy Clerk